MAGID *v.* BEAVER.

No. 12095. MARCH 9, 1938.

Robert Lee Avary Jr., Robert McMillan, and Bynum & Frankum, for plaintiff in error.

Hammond Johnson, Wheeler & Kenyon, and Charles J. Thurmond, contra.

GRICE, Justice. This case in its essence is determined by the proper application to the facts of the law embodied in the Code, § 53-503, as follows: "The wife is a feme sole as to her separate estate, unless controlled by the settlement. Every restriction upon her power in it must be complied with; but while the wife may contract, she may not bind her separate estate by any contract of suretyship nor by any assumption of the debts of her husband, and any sale of her separate estate, made to a creditor of her husband in extinguishment of his debts, shall be absolutely void." Unless the agreement here challenged is one forbidden by the terms of the statute above quoted, the directed verdict in favor of the creditor was right, because a married woman is a feme sole as to her separate estate with the exception of the restrictions imposed by this section. Comer v. Allen, 72 Ga. 1, 13; McCrory v. Grandy, 92 Ga. 319, 327 (18 S. E. 65); Nelms v. Keller, 103 Ga. 745, 746 (30 S. E. 572). The form in which the transaction takes place makes no difference, if its effect is to pledge her property or her credit for a purpose forbidden by the statute. Sutton v. Aiken, 62 Ga. 733, 740, 741; Gross v. Whitely, 128 Ga. 79, 82 (57 S. E. 94). The plaintiff in error in her plea sets up, among other things, that the note and loan deed which are the basis of the suit were for the purpose of meeting an obligation and debt of her husband, and that it was a contract of suretyship. In the opinion of the Court of Appeals the following statement is quoted from a former opinion of that court in Jordan v. Douglas Grocery Co., 27 Ga. App. 296 (108 S. E. 139): "The very essence of a contract of suretyship is that there should be some one liable as principal. This necessarily contemplates that where such a note is given there must be at least two parties who signed it and are liable for the payment thereof, the principal and the surety." Also cited in this connection are Saxon v. National City Bank of Rome, 169 Ga. 784, 788 (151 S. E. 501), and Meeks v. Withers, 181 Ga. 787, 794 (184 S. E. 604). The Jordan case did not present a state of

facts wherein the wife signed a note payable to a creditor of the husband whose debt was already in existence, the note and mortgage in that case being given for the purchase of a store and goods. In the *Saxon* case Mr. Justice Hill, in delivering the opinion observed that "A case very similar in its facts to the present is that of *Jordan* v. *Douglas Grocery Co.*" (supra), and then he quoted from the opinion in the *Jordan* case the excerpt which we have quoted from it above.

In the *Saxon* case the wife borrowed the money from the bank, the bank not being a creditor of the husband, and the money which it loaned her was not used to pay any debt of the husband. The opinion in the *Meeks* case contains the same quotation as that set out above from the *Jordan* case. That was a case where the wife filed a petition to enjoin the sale of certain realty under a mortgage executed by her alone, and to have declared void and canceled two promissory notes held by Withers. In the opinion it is recited that "She merely says 'I thought I had signed as security for one hundred dollars.'" And then Mr. Justice Gilbert adds: "She does not say that she understood that her husband or any one else was to sign as principal." The money she received did not go to benefit any creditor of her husband. In both the *Saxon* case and the *Meeks* case the quotation from the *Jordan* case seems to have been used more in the nature of argument for the conclusion reached by the court; and neither the *Saxon* nor the *Meeks* case is a full-bench decision. Suppose, however, the transaction was not one of technical suretyship. A married woman can not in any other form bind her separate estate contrary to the restriction imposed by the statute, though the method be attempted by indirection. Mr. Justice Evans' deliverance in the case of *Gross* v. *Whitely,* supra, is squarely in point: "It is not open to dispute that these Code sections [Code of 1910, §§ 2488, 2474 (1933 §§ 53-503 and 53-502)] absolutely deny the liability of the wife on a note executed by her as surety for a principal who also signs the note. In this kind of a transaction the wife attempts to bind her separate estate by indirection. By signing the note as surety she assumes a liability which, but for the statute, could be reduced to judgment, and its payment enforced against her separate estate by execution. If the wife can not bind her separate estate generally by entering into a contract of suretyship, surely she can not

bind a specific portion of her separate property by hypothecating it to pay another's debt. The case of *Klink* v. *Boland,* 72 *Ga.* 485, holds that one can not take property belonging to the wife as security for a credit sale made to the husband. If the debt is the husband's the wife can not assume its payment, either by promising to pay the debt as a surety, or by pledging her property to pay it. It is not the form of suretyship, nor whether the liability as surety is general, or only limited to the value of the pledged separate estate, which the law condemns. The spirit and purpose of the statute is to prevent the appropriation of the wife's property to the payment of a secondary or collateral liability." And see, in this connection, *Strauss* v. *Friend,* 73 *Ga.* 782; *King* v. *Thompson,* 59 *Ga.* 380; *National Bank of Athens* v. *Carlton,* 96 *Ga.* 469, 470 (23 S. E. 388); *Milton* v. *Setze,* 146 *Ga.* 26 (90 S. E. 469).

The rule that the wife may upon her own responsibility and voluntarily enter into a contract for borrowing money and giving her note therefor, and that such contract will be binding on her although the party with whom she contracts may know that she intends to use the borrowed money for her husband's benefit (*Johnson* v. *Leffler Co.,* 122 *Ga.* 670, 50 S. E. 488; *Braswell* v. *Federal Land Bank of Columbia,* 165 *Ga.* 123, 139 S. E. 861, and cit.), is not without exceptions. One exception arises in that class of cases where the contract is based on a mere colorable transaction to which the lender is a party, the purpose of which is to make the wife, to all practical intents and purposes, the husband's surety. *Williamson* v. *Walker,* 183 *Ga.* 320 (188 S. E. 346); *Freeman* v. *Mutual Building & Loan Asso.,* 90 *Ga.* 190 (15 S. E. 758); *Simmons Hardware Co.* v. *Timmons,* 180 *Ga.* 531 (3), (4) (179 S. E. 726); *Johnson* v. *Leffler Co.,* supra; *Veal* v. *Hurt,* 63 *Ga.* 728. Compare *Exchange Bank of Valdosta* v. *Newton,* 23 *Ga. App.* 792 (2) (99 S. E. 705); *Lee* v. *Johnston,* 162 *Ga.* 560 (2) (134 S. E. 166); *Central Bank & Trust Cor.* v. *Almand,* 135 *Ga.* 231 (69 S. E. 111); *Summers* v. *Lee,* 10 *Ga. App.* 441 (2) (73 S. E. 602). Another exception is found in those instances where the lender is the husband's creditor who is to be paid, and is a party to an arrangement or scheme between the husband and wife, of which the borrowing of the money by her for the purpose of paying the debts of the husband is the outcome. *Garrett* v. *Thornton,* 157 *Ga.* 487

(3) (121 S. E. 820) ; *Jackson* v. *Reeves,* 156 *Ga.* 802 (4, 5) (120 S. E. 541) ; *McCrory* v. *Grandy,* 92 *Ga.* 319 (supra).

If the facts of a particular case show that the transaction comes within either exception, the obligation is void. Let us examine the facts to ascertain whether the instant case falls within either or both of the exceptions. It is true that none of the money realized from the Beaver loan actually went into his pockets, but under the facts appearing in this record he got a direct, financial benefit from approximately twenty-four hundred dollars represented by the note to secure which the security deed was given. He had title to the property known as the Magid Orchards property, on which had been installed a cold-storage plant. This was in possession of a corporation, to wit Magid of Tallulah Inc., of which Louis B. Magid was president and principal owner. It owed Beaver originally sixty thousand dollars. Magid was indorser of the notes. The corporation had an option from Beaver to acquire the title to the properties upon making certain payments. During the construction of the cold-storage plant, Magid found that it would cost more than the money originally secured from Beaver. He so notified Beaver, and requested another loan. He asked for the advance of twenty-five hundred dollars with which to pay off the bills that were due on the erection of the cold-storage plant and to complete it, and for insurance and taxes. The testimony is that the loan was made to Mrs. Magid, and the check of Beaver handed to her contemporaneously with the execution of a paper, the substance of which is set forth above, looking to the disbursement of practically twenty-five hundred dollars. None of this money received from Beaver went to pay any debts of Mrs. Magid, nor did she retain any of it. Immediately upon the check being handed to her, she indorsed it over to the order of Magid of Tallulah, and then it was indorsed by Magid of Tallulah Inc. and deposited to its credit in a bank. The testimony further is that at the time the loan was made it was clear to Mrs. Magid just how the money was to be used by Mr. Magid. The insurance premiums were due for insurance carried on the cold-storage plant, the item for material was for material that went into it, and the item for taxes was for taxes due on this identical property, to wit the Magid Orchards property, title to which was owned by Beaver. There is some testimony tending to show that perhaps fifty dollars

of the amount of the loan went to pay incidentals. It is not necessary that the entire amount borrowed was for a purpose prohibited by the statute. If a part thereof falls within the restrictions of our Code section, the note and security deed being an entire and indivisible contract, the whole transaction is void. *Carlton* v. *Moultrie Banking Co.*, 170 *Ga.* 185 (152 S. E. 215), and cit.

We have not overlooked the fact that Magid was not the primary debtor of Beaver. He was, however, indorser of the notes held by Beaver and given by a corporation in large measure owned by Magid, and which Magid controlled. Nor have we overlooked the insistence that the money did not go to pay any debts of the husband. Some of it did go to pay taxes on property the title to which he was seeking to acquire, and of which he was in possession, some to pay premiums due for insurance on that property, and some to pay for material furnished for its improvement. Also, the record shows that Magid as a witness testified: "I was personally obligated for the debts for which the twenty-five hundred dollars went to pay. I personally guaranteed several people that had furnished necessary material for the construction of the cold-storage plant that I would see that it got paid." Nor are we unmindful of the fact, as argued by counsel for defendant in error, that Mrs. Magid never talked to Beaver about this matter, and that the husband handled the whole transaction in behalf of his wife. In this connection, however, it can not be overlooked that this record shows that after Beaver had declined to advance the twenty-five hundred dollars asked for by Magid, which was needed to complete the erection of the cold-storage plant on the properties, unless additional collateral were put up, and after Magid said there was no additional collateral which could be obtained, Beaver said, "Why don't you put up your wife's home?" and that Beaver insisted that he talk to his wife about it, stating that "if Mrs. Magid would put up as collateral her home place, he would advance the twenty-five hundred dollars to pay the insurance and taxes and what was due." The record further shows that at Beaver's suggestion the husband talked to Mrs. Magid a long time about it, but that she declined. He reported her declination to Beaver, who said, "I will not make the loan unless you get Mrs. Magid to make a mortgage on her home place. You go again and

tell her there is no risk to it. You will get your property back, and she will get her property back." Magid had another conference with his wife with this end in view, and she reluctantly gave her consent. On this subject the evidence of Magid is: "I then saw Mr. Beaver again and told him that she very strenuously objected; but since he insisted upon it, she agreed to make the mortgage and give the collateral to pay the insurance and the taxes."

It has been suggested that the effect of the testimony of L. B. Magid on the subject of his personal liability on some of the indebtedness referred to is merely that Magid had undertaken to assume the debt of another, his promise so to do not being in writing, and therefore not valid under the statute of frauds. The witness does not swear that his promise was oral. It does not appear that he was asked on cross-examination whether or not his undertaking was in writing. He testified: "A part of the $2500 evidenced by the note sued on in this case went in payment of a debt I owed J. E. Harvey." Also, that he told Beaver he was personally obligated for certain debts, and that he (Magid) owed the Harvey debt individually. Elsewhere he testified that the Harvey debt was incurred in the name of Magid of Tallulah Inc. Harvey swore, as shown above, that he furnished some of the material; that he made a contract to do so with Magid; that he extended the credit to Magid; that he sold to Magid on credit; and that he did not know that this property was being operated in the name of Magid of Tallulah Inc. Even if it be assumed that there was a conflict in the testimony of the two last-named witnesses, this would not prevent the defendant from having her case submitted to the jury, and for them to pass on any issue between the two. If the lender of money to a married woman knew that she borrowed it to pay a debt of her husband, and aided him in a scheme for that purpose, the agreement evidencing the loan is subject to attack by the wife. See authorities collected in *Saxon* v. *National City Bank of Rome*, 169 *Ga.* 784, 790-791 (supra).

The Court of Appeals erred in affirming the judgment refusing a new trial. *Judgment reversed. All the Justices concur.*